SAMUEL PARKER, *et al.*, v. THE SCHALLER SAVINGS BANK, *et al.*, Appellants.

**Specific Performance:** REFORMATION. Plaintiff *knew* that his debtor owed a bank about two thousand dollars, and that the bank held a land contract as collateral. He entered into an agreement with it that this land contract should be assigned to him upon the payment of what was due the bank from plaintiff's debtor. This was made with an officer who was acting as cashier, temporarily, and who had little personal knowledge of the details of its affairs. In making the computation, this officer, by overlooking one note, found the sum due to be about fourteen hundred dollars. This mistake, did not, in any way, change plaintiff's position or lose him any remedies against his debtor which should and could have been used. *Held*, the contract should have been reformed to include the omitted note, and that no specific performance of the agreement to assign the land contract should be decreed, except upon payment of all due the bank, including the omitted note.

*Appeal from Buena Vista District Court.*—HON. LOT THOMAS, Judge.

FRIDAY, MAY 15, 1896.

ACTION in equity. Decree for plaintiffs, and defendants appeal.—*Reversed.*

*A. D. Bailie* and *Chas. D. Goldsmith* for appellants.

*H. T. Schultz* and *H. F. Galpin* for appellees.

KINNE, J.—I.   November 7, 1893, Webber, one of the defendants, was indebted to the Schaller Savings Bank, upon two promissory notes,—one for one thousand, three hundred and twenty-three dollars and sixty cents, and the other for four hundred and fifty dollars,

—and at the same time he was indebted to the defendant Patterson, on one note, in the sum of four hundred and ninety-four dollars and fifty cents. To secure all of this indebtedness, Webber assigned to the bank and Patterson, jointly two certain contracts or leases which he held, and which were executed by the Iowa Agricultural College, for a half section of land in Buena Vista county. On and prior to February 7, 1894, Webber was indebted to appellees, who resided in Alta, Iowa, upon two promissory notes. Webber was preparing to move out of the state, and had advertised his personal property for sale. Prior to February 7, 1894, the appellant Patterson, having learned that Webber was indebted to appellees, and being an old acquaintance of one of them (Parker), told him that Webber was preparing to go away, and he (Parker) had better be looking after his notes. He also told Parker what amount was due the Schaller Savings Bank and himself, on their three notes. Along in January, 1894, Parker had also learned from the cashier of the Schaller Savings Bank that Webber owed that bank and Patterson about two thousand four hundred dollars. On February 7, 1894, Parker, having seen Webber's bills, advertising his personal property for sale, on the next day went to see Webber about paying, or securing, the two notes due appellees, and informed Webber that he had the necessary papers to attach his (Webber's) property, unless he secured him. Webber said all his personal property was mortgaged, and he did not consider there was anything in it, over and above the mortgages. Finally, Webber proposed to Parker that, if he would extend his notes for one year, and pay off what Webber owed the Schaller Savings Bank, and Patterson, he would assign the land contracts to appellees. Parker told Webber he had been informed that he (Webber) owed the bank and Patterson about two thousand four

hundred dollars. Webber contended that he only owed them about one thousand five hundred dollars, and claimed he had paid a portion of the debt. Parker was not willing to take Webber's word as to the amount, and said they would go and see the bank and Patterson, and find out about it. Parker called at the bank, and, the cashier not being in, he informed Mr. Ivens, the vice-president, and who was then acting as cashier, that he wanted to take up the contracts, and pay the bank what was coming to it and Patterson, and have the contracts assigned to him. Ivens agreed to this, but said he did not know much about the matter, as he did not have much to do with the active management of the bank. He found the one note for one thousand three hundred and twenty-three dollars and sixty cents, and computed the amount due thereon, and procured the amount due on the Patterson note, added the two amounts, and gave the sum total to Parker, who drew up the following agreement: "Schaller, Iowa, Feb. 7, 1894. This agreement, made and entered into the date above written, between the Schaller Savings Bank, of Schaller, Iowa, of the first part, and Parker & Tincknell; of the second part, of Alta, Iowa, witnesseth: For and in consideration of the payments to be made as hereinafter stipulated, the party of the first part agree to sign all their right, title and interest in and to the south half of section numbered twenty-six, in Lee township, in Buena Vista county, Iowa, subject to the payment of eighteen hundred thirty-one and 29-100 dollars, said payment to be made on or before the 7th day of March, A. D, 1894." This paper was signed by the bank, by Ivens, its vice-president, and by Parker & Tincknell. Patterson did not sign it. By oversight of Ivens, the note for four hundred and fifty dollars, held by the bank against Webber, was not embraced in the amount given to Parker, it being at

the time in Chicago. Patterson refused to sign any paper until his money was paid him. February 9, 1894, the cashier of the bank returned, and, finding that the four hundred and fifty dollar note had been omitted from the computation, at once wrote appellees the fact, and that the bank would expect it to be paid, also, if they turned over the contracts or leases. Parker admits receiving this letter February 11, 1894, and states that he took no steps whatever to protect himself, except to write Webber to go to the bank and fix up the matter of the four hundred and fifty dollar note. Webber received the letter, and called at the bank, and offered some other collateral to secure the four hundred and fifty dollar note; but it was not satisfactory to the cashier, and he suggested to Webber to arrange to let appellee have it as further security. Webber was at or about his home for some days after the sale, and did not finally remove until about February 22, when he took away with him some one thousand to one thousand five hundred dollars in money, and a car-load of personal property, valued at five hundred dollars, which was openly loaded at Schaller. March 7, 1894, Parker and his attorney, Schultz, went to the savings bank and counted out and tendered the sum stated in the agreement, and demanded the assignment of the contracts. No separate tender was made to Patterson or to the bank. The bank offered to accept the tender if it was meant to pay their entire claim, and Patterson said he would assign his interest when he got his money. The foregoing are the main, and, as we think, established, facts in the case. Some others may be referred to in the further consideration of the question discussed. Plaintiffs bring this action for a specific performance of the agreement to assign the contracts, and a decree was entered in their favor. Defendants pleaded that the agreement did not bind

the bank, because not executed as required by its articles of incorporation, claim that the mistake in omitting the four hundred and fifty dollar note was mutual, and ask for the reformation of the agreement accordingly.

II. Counsel for appellant argue three propositions: *First*, they insist that the agreement which it is sought to specifically enforce is not a valid and binding obligation upon the Schaller Savings Bank because it was not executed as provided by the articles of incorporation and by-laws governing said bank; *second*, it is said that it is not shown, by either the pleadings or evidence, that appellant Patterson in any manner bound himself to assign his interest in the lands, and there was no consideration to support such an agreement if made; *third*, that upon the merits of the case plaintiffs were not entitled to a decree. We find it necessary to consider only the last point made. From the statement heretofore set out, and from the evidence, it appears, we think, very satisfactorily, that plaintiffs, at the time Parker went to the bank to make an arrangement to take the claim of the bank and Patterson's claim, knew that said claims amouted to about two thousand four hundred dollars. Indeed, Parker admits, in his testimony, that he had been so informed, and when Webber told him he had reduced the amount of these claims to one thousand five hundred dollars by payments, he (Parker) would not take Webber's statement as correct, but insisted that they go to the bank and ascertain the real facts. Now, Parker claims that Webber was present during the entire interview at the bank; but, from all of the evidence, we are warranted in saying that in this he is mistaken. It is evident that Webber was present only a few minutes. With the knowledge which Parker had previously obtained from the cashier of the bank as to the amount of the

Webber debt due it and Patterson, being two thousand four hundred dollars, it is strange that Parker made no mention of that fact to the vice president of the bank, and said nothing about the claim made by Webber to him, that he had reduced these claims by payments to one thousand five hundred dollars. Another fact, we think, appears clearly, and that is, that the arrangement between Webber and Parker was that plaintiffs should take up all of Webber's indebtedness to the bank and Patterson, in case the matter was consummated. There is no doubt that, when the agreement for the assignment was entered into, Parker had every reason to believe, from his knowledge previously obtained, that the amount due the bank and Patterson was several hundred dollars more than it was then figured. Now, it was the intent of both parties to the agreement, that the one should take up, and the other sell, all the claims the bank and Patterson had against Webber; but this intent was not, in fact, executed because of the omission to find the four hundred and fifty dollar note, which was not then in the bank. Had the four hundred and fifty dollar note been discovered, the agreement, as in fact made, and which did not include it, would never have been entered into. Under such circumstances, we fail to see why the bank should be compelled to specifically perform this agreement, which, by reason of such mistake, does not in fact represent the intent of the parties to the agreement. We think the contract should have been reformed, as prayed for by defendants. If, as a matter of fact, it appeared that the situation of plaintiffs had been changed to their detriment, prior to the discovery by defendants of the mistake, and prior to the time plaintiffs were informed of it, there might be some ground for claiming that the contract, as in fact entered into, should be enforced. But we do not

think such a claim can be sustained from the evidence. While it is true, that Parker claims he was ready to attach Webber's personal property, in case the arrangement with the bank and Patterson was not consummated, yet he testifies that he had made inquiries touching Webber's personal property, and found it was so incumbered that there was no margin in it for him over and above the mortgages. It cannot be said, therefore, that plaintiffs relinquished any right or advantage by abandoning their proposed attachment. If, as appears from Parker's own evidence, his remedy by attachment would have been unavailing, then plaintiffs lost nothing by waiving such right, even though they were induced so to do by reason of having entered into the agreement for an assignment of the interest of the bank and Patterson, in Webber's land. There can be no foundation for a claim that the bank designedly so acted as to induce plaintiffs to alter their situation to their detriment, and it is equally clear that plaintiffs gave up no security, or were otherwise induced to, or did act to their detriment, by reason of the act of the bank. *Wishard v. McNeill*, 85 Iowa, 474 (52 N. W. Rep. 484). It also appears that, on February 11, 1894, plaintiffs knew, from the bank, that the four hundred and fifty dollar note had been omitted, and were then advised that the bank would expect it to be paid, also, in case they assigned the contracts. Plaintiffs, after having this knowledge, did nothing to protect themselves, save to write a letter to Webber asking him to fix the four hundred and fifty dollar matter up with the bank. Webber did not leave Schaller until eleven days after that, and when he did go, took five hundred dollars worth of personal property, and one thousand to one thousand five hundred dollars in cash. In the letter of plaintiffs to the bank, in reply to the notice given them by the bank of the omission of the four

hundred and fifty dollar note, and that the bank would expect that paid in case they made an assignment of the contracts, plaintiffs made no intimation that they would not pay it in case Webber did not. Plaintiffs, then with full knowledge of the mistake, did not indicate that they expected to hold the bank to the strict enforcement of the contract, regardless of the four hundred and fifty dollar note. Plaintiffs had it in their power to put themselves in as good a position, as regards Webber or his property, as though the agreement to assign the contracts had never been entered into. The case will be remanded for a decree in conformity with this opinion.—REVERSED.